Elease RICHBOW, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 90–456.

District of Columbia Court of Appeals.

Argued Oct. 16, 1991.

Decided Dec. 9, 1991.

A. Palmer Ifill, Washington, D.C., for appellant.

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

 In this medical malpractice action in which the personal representative was substituted for the deceased plaintiff, the jury found by special verdict that the defendant District of Columbia provided negligent care and treatment to Joe Richbow following his surgery at D.C. General Hospital in 1976, but that the District's negligence did not proximately cause Mr. Richbow's ensuing injuries. On appeal, appellant's primary contentions are that the trial judge should have granted her motion for a new trial on evidentiary grounds, and should not have permitted one of the deceased plaintiff's physicians to testify as an expert witness on behalf of the defendant. We affirm.[1]

---

1. Appellant's other assignments of error are without merit. The denial of her summary judgment motion is not appealable, *Morgan v. American University*, 534 A.2d 323, 328 (D.C. 1987), and in any event, we cannot say that appellant was entitled to judgment as a matter of law.

Nor did the judge err in dismissing a juror for cause and replacing him with an alternate. *See* Super.Ct.Civ.R. 47(b) (1991). "A trial judge has broad discretion in deciding whether to excuse a juror for cause." *District of Columbia v. Anderson*, 597 A.2d 1295, 1301 (D.C.1991). The juror in question had been sleeping through the evidence and appellant's counsel acknowledged

## I.

In May of 1976, staff at D.C. General Hospital removed a pre-cancerous tumor known as a villous adenoma from the colon of Joe Richbow, who was then 63 years old.[2] He was released from the hospital, and the insufficiency of the follow-up care offered or provided by D.C. General gave rise to the jury's finding of negligence. Nearly four years after the operation, Mr. Richbow complained to a physician treating him for another illness that he was experiencing rectal bleeding of the kind that had resulted in the first operation. The physician referred Mr. Richbow to Dr. Warren Strudwick, a general surgeon with considerable expertise in oncology. Dr. Strudwick discovered a villous adenoma in Mr. Richbow's colon in the same area where the previous tumor had been found.[3] Dr. Strudwick believed that this tumor, larger than the first, was probably malignant, and recommended an abdominal perineal resection and colostomy—an operation entailing removal of the affected portion of the colon, closure of the anus, and establishment of a stoma, an artificial opening in the pelvic area through which bowel waste can be excreted. Mr. Richbow submitted to this operation on April 16, 1980.

Complications immediately ensued. Over the next four years, these resulted in successive operations to improve the colostomy and the creation of a second stoma. In 1985, a new polyp was discovered in Mr. Richbow's transverse colon. Although this was diagnosed as a non-malignant villous adenoma, the manifest failure of the colostomy and Mr. Richbow's apparent predisposition to developing these pre-cancerous lesions caused the doctors to perform an ileostomy on him. This involved removal of the rest of the colon and attachment of the end of the small intestine to yet a third artificial opening in the pelvic wall. Still further corrective procedures were required after this operation, and Mr. Richbow continued to experience pain and discomfort until 1988.[4] No claim of malpractice was made against Dr. Strudwick or the doctors who treated plaintiff after 1980. Rather, the pain, expense, and embarrassment attending Mr. Richbow's colostomy and the complications which ensued were alleged to have been proximately caused by the failure of D.C. General Hospital to provide proper follow-up care between 1976 and 1980, which would have permitted earlier discovery of the second tumor and in-

that fact. See *Golsun v. United States,* 592 A.2d 1054, 1057 (D.C.1991) (when court learns of sleeping juror, it has duty to inquire and take corrective action if necessary). While it would have been preferable had the judge dired the juror on the record before excusing him, *id.* there was no abuse of discretion.

Furthermore, appellant has shown no prejudice from the trial court's innocuous *ex parte* communication with the jury. The only result of asking the jury why it wanted a dictionary was the decision of the judge, taken with the unqualified assent of both parties, to re-instruct the jury on the legal definition of proximate cause. Appellant may not complain now of the giving of an instruction to which she affirmatively assented. See Super.Ct.Civ.R. 51 (1991); *District of Columbia v. Mitchell,* 533 A.2d 629, 636–37 (D.C.1987).

We do not decide whether the judge abused her discretion in denying appellant's untimely request to depose defendant's expert. Appellant has not perfected the record in this matter. See *Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982). But, we note that appellant's perfunctory claim of prejudice is not supported by the evidence. Dr. Strudwick testified in a manner that was consistent in all material respects with the representations made in defendant's

Rule 26(b)(4) statement, and plaintiff's cross-examination of him was highly effective. Appellant may not claim prejudice from an inability to cross-examine on the issue of causation when the record is clear that her counsel made a tactical decision not to probe the issue at all.

Finally, we perceive no prejudice to appellant from the four-month delay in taking Mr. Richbow's *de bene esse* deposition.

2. Joe Richbow instituted the present action against the District of Columbia on May 27, 1988. The trial court refused to dismiss the case as barred by the statute of limitations or the mandatory notice provision of D.C.Code § 12–309 (1989), and the District has not taken a cross-appeal.

Mr. Richbow died before trial. His wife Elease Richbow was substituted as plaintiff in the action, and she brings this appeal.

3. The tumor was located five to seven centimeters from the anal verge, extended about ten centimeters in length, and completely encircled the bowel.

4. He died of a pulmonary embolism on January 27, 1990.

ferentially less radical procedures to cure it. The jury found that although D.C. General was negligent in its follow-up care, that negligence was not the proximate cause of Mr. Richbow's injuries.

## II.

■■■ Appellant did not move for a directed verdict or for a judgment notwithstanding the verdict, but argues instead that the judge should have granted her motion for a new trial on the ground that the verdict was against the weight of the evidence. This argument need not detain us long. When the trial court denies a motion made on this ground and sustains the jury's verdict, our scope of review "is very narrow indeed." *Felton v. Wagner*, 512 A.2d 291, 295 (D.C.1986) (citing *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1111 (D.C.1986)). *See Rich v. District of Columbia*, 410 A.2d 528, 535 (D.C.1979) (appellate review is restricted where "trial court's unique opportunity to consider the evidence in the context of a living trial coalesces with the deference properly given to the jury's determination of such matters of fact as the weight of the evidence" (citations and internal quotation marks omitted)). The trial judge, for her part, may set aside a verdict supported by substantial evidence and grant a new trial only when the verdict is against what variously has been described as the "clear" or "great" weight of the evidence. *Eastern Airlines v. Union Trust Co.*, 99 U.S.App.D.C. 205, 209, 239 F.2d 25, 29 (1956), *cert. denied*, 353 U.S. 942, 77 S.Ct. 816, 1 L.Ed.2d 760 (1957); *Winter v. Brenner Tank, Inc.*, 926 F.2d

468, 471 (5th Cir.1991); *see also Weeda v. District of Columbia*, 521 A.2d 1156, 1160 (D.C.1987) (applying clear weight of the evidence standard on review of denial of new trial motion).

■■■ In this case, the jury's special verdict on causation means that it found that the District's failure to periodically monitor plaintiff following the 1976 operation did not substantially cause the need for the colostomy operation; plaintiff would have had to undergo the same surgery whether the hospital staff furnished proper follow-up care or none at all. Appellant's primary claim is that this finding is unsupported by an expert opinion rendered within a reasonable degree of medical certainty. We need not decide, however, whether Dr. Strudwick, whom the District called as its expert, rendered such an opinion.[5] It was plaintiff, not the defendant District of Columbia, who was required to establish the elements of the malpractice claim by expert testimony. *Washington v. Washington Hosp. Center*, 579 A.2d 177, 181 (D.C.1990) (expert testimony usually required to establish each element of medical malpractice claim). In general a jury is not bound by the testimony of any witness, even an expert. *District of Columbia v. Howard*, 588 A.2d 683, 690 (D.C. 1991) (citing cases); *Insurance Co. of North America v. GMR, Ltd.*, 499 A.2d 878, 883 (D.C.1985) (citing cases). Although an expert's testimony may not arbitrarily be disregarded or disbelieved, *Rock Creek Plaza–Woodner Ltd. v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983), when there is some basis in the record for

---

**5.** Dr. Strudwick's opinion on the issue of causation admits of multiple interpretations. He was asked:

> Q. Do you have an opinion, with a reasonable degree of medical certainty as to whether early detection of the tumor would have permitted another method of eliminating the cancer?
>
> A. *No, not with certainty. However*, because this was a reoccurrence, because he had had cancer in the same area or the villous adenoma in the same area, *I would*—no matter what the size, *I think that I would* have recommended the same type of therapy. [Emphasis added.]

A natural reading of this colloquy—perhaps the most natural reading—is that the doctor declined the invitation to render an opinion within a reasonable degree of medical certainty that early detection would have allowed another form of treatment. Or he may have meant, variously, that it could *not* be said to a reasonable medical certainty that early detection would have permitted another method of eliminating the cancer, or that even if detected early, the cancer could not be eliminated with certainty by any form of treatment less radical than a colostomy.

concluding that an expert witness should not be credited, we will not pit our judgment against that of the finder of fact who saw and heard the witness testify. *See id.*

▮▮▮▮ Appellant introduced expert testimony through Dr. Lawrence Feinman that if the second lesion had been detected at an early stage, measures short of a colostomy would have sufficed and the extensive surgery from 1980 onward could have been avoided. There was, on the other hand, ample evidence from which the jury could resolve to reject that conclusion. Whether or not Dr. Strudwick rendered a contrary expert opinion, he made clear that *he* would have recommended the same treatment for Mr. Richbow if any size tumor had reoccurred in the portion of the colon previously affected. See note 5, *supra.* This was not merely the opinion of a doctor who taught surgery, who had been associated with the Howard University tumor clinic for over twenty years, and who had published papers on cancer, but the opinion of a physician who had actually examined and treated plaintiff and had personal knowledge of his medical history. *See Adkins v. Morton*, 494 A.2d 652, 658 (D.C.1985) (non-party treating physician may testify about opinions developed in course of treatment even if not listed as expert on Super.Ct.Civ.R. 26(b)(4) statement). The jury was entitled to give this opinion substantial weight in assessing the adequacy of Dr. Feinman's expert opinion.[6] Moreover, there was additional evidence, including testimony from Dr. Feinman himself, which would allow the jury to find

readily that: (1) plaintiff was of an age and physical makeup that predisposed him to develop colon tumors; (2) the 1976 operation failed to eradicate completely the precancerous lesion in Mr. Richbow's colon; (3) the tumor grew back; (4) the 1980 operation was medically necessary; and (5) the location of the tumor and the fact of its reappearance would have made an abdominal perineal resection and colostomy medically appropriate even if the tumor had been detected earlier. Under the requisite standard of review, and even if we assume the District adduced no expert testimony on the issue of causation, it cannot be said that the jury's verdict was against the clear weight of the evidence so as to require a new trial.[7]

### III.

▮▮▮▮ Appellant further contends that it was error for the court to permit Dr. Strudwick to render an expert opinion on negligence and causation over the plaintiff's objection. Appellant concedes that Dr. Strudwick could properly testify as a fact witness for the defense. But she argues that permitting a non-party treating physician to testify as an expert in these circumstances violates the physician-patient privilege embodied in D.C.Code § 14–307 (1989) even if the patient does not object to the physician's factual testimony. We find no merit in this argument.

D.C.Code § 14–307(a) provides that

a physician ... may not be permitted, without the consent of the person afflicted, or of his legal representative, to dis-

---

**6.** *Meek v. Shepard,* 484 A.2d 579 (D.C.1984), is not to the contrary. In that medical malpractice case, we held that the testimony of an expert witness was insufficient to *establish* the requisite standard of care when the expert, who was not a treating physician, only testified as to what he would have done in like circumstances. *Id.* at 581–82. The issue here is whether the jury could properly credit the testimony of a non-party treating physician who contradicts plaintiff's expert on the element of causation. Nothing in our cases implies it may not.

Furthermore, given the fact that, under *Adkins,* a non-party treating physician may testify about opinions developed in the course of treatment, we do not believe that the fact that such a physician is also qualified as an "expert" makes

his testimony more prejudicial than probative; the opposing party is always free to argue to the jury that procurement of an expert inherently affects that expert's loyalty and judgment.

**7.** Appellant maintains, as a variation of her argument, that the District presented no evidence to show that its negligence did not substantially cause the second villous adenoma to develop into a cancerous lesion. Not only does this argument misconceive the burden of proof, but the testimony of appellant's own expert provided a basis on which the jury could find that the frequency of periodic monitorings would have diminished over time thus permitting the tumor to begin growth and become malignant in an interval between properly scheduled check-ups.

close any information, confidential in its nature, that he has acquired in attending a client in a professional capacity and that was necessary to enable him to act in that capacity, whether the information was obtained from the client or from his family or from the person or persons in charge of him.

Appellant, as Mr. Richbow's legal representative, introduced copious evidence about the 1980 colostomy performed by Dr. Strudwick and the medical condition that made it necessary. Further, the District called Dr. Strudwick as a fact witness and he testified at length about his treatment of Mr. Richbow without objection by appellant. Thus we have no occasion to decide whether appellant waived the physician-patient privilege simply by instituting a medical malpractice action that put Mr. Richbow's medical condition in issue. *But see Sklagen v. Greater Southeast Community Hosp.*, 625 F.Supp. 991, 992 (D.D.C.1984) (filing action which places physical condition in issue waives physician-patient privilege); *cf. Fisher v. Small*, 166 A.2d 744, 747 (D.C.1960) (voluntary exchange of medical reports by parties waived physician-patient privilege as to medical condition in issue). Appellant's acknowledgement at trial and on appeal that Dr. Strudwick's fact testimony was admissible is an unambiguous waiver of the privilege shielding confidential information. The only question before us is whether appellant may nevertheless object to Dr. Strudwick's being asked to offer an expert opinion based upon his treatment of Mr. Richbow and familiarity with his medical condition.

 The physician-patient privilege, unlike the attorney-client privilege, is not a child of the common law but a creature of statute. *Clifford v. United States*, 532 A.2d 628, 637 (D.C.1987); *In re Estate of Wilson*, 416 A.2d 228, 233 (D.C.1980). It is an evidentiary privilege only, and extends no further than the courtroom door. *Doe v. Stephens*, 271 U.S.App.D.C. 230, 237, 851 F.2d 1457, 1464 (1988); *cf. Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 590–92 (D.C.1985). This court has not decided the precise issue raised by appellant, but several of our decisions are instructive

on the desirability of allowing parties to obtain opinion testimony from physicians involved as participants in or witnesses to the treatment in question. In *Abbey v. Jackson*, 483 A.2d 330 (D.C.1984), for example, we held that the plaintiff-appellant in a medical malpractice action who had not hired her own expert could nonetheless make out a prima facie case through use of the expert testimony of defendant physicians or defense witnesses who had personal knowledge of the relevant facts. *Id.* at 334. Our reasoning was founded primarily on considerations of policy underlying the adverse witness rule of D.C.Code § 14–301 (1989), "which is intended to ensure that persons who are eyewitnesses to and participants in the event giving rise to an action fully disclose all matters pertinent and relevant to the issues in dispute." 483 A.2d at 333 (citations omitted). We noted, for example, that "witnesses with personal knowledge of relevant facts [do not] have a right to refuse to testify on the ground that the answer will be 'expert' evidence and they have received no expert witness fee." *Id.* at 334. Acknowledging the plaintiff's obligation to establish at least part of her cause of action by expert testimony, we concluded that she "need only question defendants or defense witnesses who are 'experts.' ... [T]he physicians who were participants or eyewitnesses in the events leading to this cause of action cannot refuse to testify on pertinent and relevant issues merely because their information is the result of professional training." *Id.*

In *Abbey* we also rejected the argument that plaintiff was required to list the defendant physicians and defense witnesses in her Super.Ct.Civ.R. 26(b)(4) statement of expert witnesses she planned to call. We quoted the Advisory Committee note to Fed.R.Civ.P. 26(b)(4) that the rule " 'does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.' "

*Id.* at 335. We held that plaintiff could "question appellees as well as appellees' witnesses as experts" despite the failure to list them under Rule 26(b)(4), because "their expertise ... was not developed in anticipation of litigation." *Id.* In *Adkins v. Morton, supra,* we found the second holding of *Abbey* dispositive and reversed a malpractice judgment in behalf of plaintiff because the trial judge, relying on the failure to list a treating physician under Rule 26(b)(4), had barred the doctor from testifying about why he had not ordered home nursing care for the plaintiff and about his opinion why she would not need such care. "[T]he crucial inquiry," we said, "is whether the facts and opinions possessed by the expert were obtained for the specific purpose of preparing for the litigation." 494 A.2d at 657. The doctor, "while unquestionably an expert," *id.* (citation omitted), had acquired his opinion while treating plaintiff; and "[s]ince the jury had heard the testimony of [plaintiff's] experts as to why she needed home nursing care, in fairness it should also have heard Dr. Ellis— her treating physician—testify about why she did not." *Id.* at 659. *See also District of Columbia v. Howard,* 588 A.2d 683 (D.C.1991).

None of these decisions involved a claim of physician-patient privilege as in this case. Nonetheless, each suggests the particular relevance of opinion testimony by physicians who form those opinions while treating a patient for injuries that later become the issue in litigation. In our judgment, there is no satisfactory basis for, on the one hand, conceding that a physician may testify about the facts of his patient's treatment but, on the other, disputing the admissibility of an expert opinion formed in the course of, or on the basis of, that treatment (even though rendered by the physician as a paid expert). Having waived the privilege as to factual information, a plaintiff may not keep from the factfinder the medical judgments and opinions which were derived from the treatment and which indeed shaped it.

The Supreme Court of North Carolina has reached a similar conclusion in a case in which the issue likewise was whether "plaintiffs who waive their physician-patient privilege as to 'information' may nevertheless preclude their physicians from giving opinion testimony." *Cates v. Wilson,* 321 N.C. 1, 13, 361 S.E.2d 734, 742 (1987). The court began by noting the principle underlying a previous North Carolina decision "that when a patient discloses, or permits disclosure of, information gained by the physician during the physician-patient relationship, the rationale for the physician-patient privilege evaporates." *Id.* at 14, 361 S.E.2d at 742. The court found an implied waiver in *Cates* based in part on the fact that "[p]laintiffs did not object when defendants called [the treating] physicians as witnesses and elicited from them detailed descriptions of the nature of plaintiffs' injuries." *Id.* at 15, 361 S.E.2d at 743. The court held "further that this waiver extended to any opinions held by these treating physicians formed as a result of information gained during their treatment of the plaintiffs." *Id.* The court reasoned, first, that the state's physician-patient privilege, comparable in statutory language to the District's law,

itself suggests no division between opinion and information, and no such division is necessary to give effect "to the plain sense of the text." ... [T]he statute's plain sense serves to protect a patient from public disclosure of the details of his relationship with his physician. A patient who discloses that which he has a right to keep confidential loses the right to claim the statute's protection.

A second reason that we decline to adopt the divisible waiver ... is its possible misuse by plaintiffs in personal injury actions. A divisible waiver could enable plaintiffs to elicit from their physicians factual details underlying their cases and then preclude these physicians from placing this information in a legally relevant context. When a patient dissolves the fiduciary relationship with his physician by disclosing or permitting disclosure of details of their consultations, he should not, in fairness, be allowed to prevent the physician from stating an opinion which might aid the trier of fact

in assessing the merits of the patient's case. To hold otherwise would enable patients to use the privilege not defensively to protect their confidences but offensively to suppress the truth in litigation.

*Id.* at 16, 361 S.E.2d at 743 (citations omitted); *see also Howard,* 588 A.2d at 693 (prejudicial error to preclude non-party treating physician from offering expert opinion where as a result jury misled on issue of causation); *Adkins,* 494 A.2d at 659 (prejudicial error to preclude non-party treating physician from offering expert opinion where as a result jury misled on issue of damages).

 We agree with the North Carolina court that an implied waiver exists when the patient discloses, or permits disclosure of information gained by the physician during the physician-patient relationship, *see Clifford,* 532 A.2d at 637, and that in these circumstances there is no "divisible waiver." Appellant introduced detailed evidence of Mr. Richbow's medical history, including his treatment by Dr. Strudwick, and did not object to similar testimony adduced by the defense. Having waived her husband's physician-patient privilege, she may not preclude the physician from offering expert opinion grounded in the facts which she set before the jury.

The judgment of the Superior Court is

*Affirmed.*